Eddie C. Holcombe and June D. Holcombe, Petitioners v. Commissioner of Internal Revenue, Respondent

Docket No. 7398–77.    Filed October 17, 1979.

*R. Wayne Byrd* and *Charles W. Marchbanks,* for the petitioners.

*Donald W. Williamson, Jr.,* and *Maurice W. Gerard,* for the respondent.

Scott, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1973, 1974, and 1975 in the amounts of $7,419.21, $14,348.01, and $8,250.90, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following:

(1) Whether Eddie C. Holcombe (petitioner) is entitled to deductions for charitable contributions of eyeglasses, lenses, and frames which he collected from various friends and patients and transferred to charitable organizations.

(2) If petitioner did make contributions of eyeglasses, lenses, and frames to the various charitable organizations, whether the fair market value of the items contributed was in excess of the amounts determined by respondent.

(3) Whether the fair market value of the eyeglasses, lenses,

and frames collected by petitioner represented gross income to petitioner in the years in which the items were contributed to the various charities.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided in Greenville, S.C., at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1973, 1974, and 1975 with the Director of the Internal Revenue Service Center, Chamblee, Ga.

From 1961 throughout the years 1973, 1974, and 1975 here involved, petitioner was an optometrist practicing in Greenville, S.C. For years prior to 1973, and during the years 1973, 1974, and 1975, petitioner received a large number of used prescription eyeglasses, lenses, and eyeglass frames from his patients, acquaintances, and friends.

Petitioner, after receiving a B.S. degree from Furman University and doing graduate work at the University of South Carolina, enrolled in the Southern College of Optometry in Memphis, Tenn. In 1961, he received his Doctor of Optometry degree from the Southern College of Optometry and immediately began his practice in Greenville, S.C. In his work as an optometrist, petitioner examined the eyes of people and prescribed glasses or contact lenses. Petitioner also had a laboratory in which lenses were ground, but this work was done for petitioner by an optician. Petitioner, almost from the time he commenced practice as an optometrist, was interested in eye care for indigents. In his view, there should never be anybody who has to go without eyeglasses because of an inability to pay. Petitioner's patients and friends in the Greenville area knew of petitioner's work with indigents and for several years prior to 1973, and during the years 1973, 1974, and 1975, would leave their old lenses or, if the frames were changed, the frames with the lenses in them with him after they were fitted with their new prescriptions.

Petitioner, through the years, developed an interest in going out into the missionary field to do work for indigents, and in the year 1972 he went to Korea to work for the Medical Benevolent Foundation. The Medical Benevolent Foundation (foundation) is

the medical arm of the Southern Presbyterian Church. Its purpose is to support the medical missionary work of the Southern Presbyterian Church. Petitioner was a member of that church. He volunteered his time and paid his own expenses in connection with going to Korea for the foundation in 1972. While in Korea, he examined eyes of various persons who came to the clinics operated by the foundation. These clinics had on hand various eyeglasses, lenses, and frames which had been donated to the foundation and sent to the clinics in Korea for use of the patients at those clinics. When petitioner examined a patient at the clinic and determined the prescription he needed for the glasses, he would go to the available glasses at the clinic and select the glasses which, if possible, fitted the prescription for the particular patient exactly. If there was no exact fit among the glasses available, petitioner would find the prescription closest to that needed by the clinic patient and give the patient those glasses. Generally, small variations in the power or type of lenses in glasses are not sufficient for an individual to notice the difference in wearing the glasses. As a result of petitioner's work in Korea, a half-page article was written about his work with the indigents and this article was widely circulated in the Greenville area. Petitioner was a member of the Elks, Lions, and Jaycees in Greenville.

On January 1, 1973, petitioner had on hand a large supply of used glasses and lenses which he had accumulated. Also, petitioner continued to receive such used glasses and lenses during 1973, 1974, and 1975. In fact, when he fit glasses for a patient, instead of merely placing the old glasses or the old lenses in a bag and handing them to the patient, he would hand the lenses or glasses back to the patient and say "here are your old lenses" or here are your old glasses. Quite often the patient would say "I haven't any use for them," and petitioner would say "I'd like to have them." Generally, the patient would let petitioner keep the old lenses or old glasses. This was petitioner's customary practice with his patients. Petitioner in his practice of optometry used certain of the frames he purchased for display. The cost of these frames was entered as a part of his cost of frames purchased on his books, and their cost was deducted as part of cost of goods sold on his Federal tax return. Approximately every 3 or 4 months, petitioner would change the display of frames in order to be able to show the newest fashions in

frames. He retained the old frames which had been displayed and put them with the used frames and lenses which he collected from patients and friends.

In 1973, petitioner transferred an assortment of glasses and frames to the following charitable organizations:

| Organization | | Items given |
|---|---|---|
| Southern College of Optometry ......... | 34 | frames |
| | 75 | frames |
| New Eyes for the Needy, Inc ........... | 283 | pairs single-vision glasses |
| | 184 | bifocal glasses |

The 109 frames transferred to the Southern College of Optometry were frames which petitioner had for display that had become obsolete because of style changes.

In 1974, petitioner transferred an assortment of glasses, lenses, and frames to charitable organizations as follows:

| Organization | | Items given |
|---|---|---|
| New Eyes for the Needy, Inc ....... | 228 | pairs single-vision glasses |
| | 66 | pairs bifocal glasses |
| | 237 | pairs single-vision glasses |
| | 76 | pairs bifocal glasses |
| Hospital St. Croix-LeOgaine, ........ | 6 | pairs bifocal glasses |
| Haiti (a health facility | 16 | pairs bifocal glasses |
| operated by the Medical | 16 | pairs single-vision glasses |
| Benevolent Foundation of | 14 | pairs single-vision glasses |
| Southern Presbyterian Church) | 73 | plain frames |
| | 27 | trimmed frames |
| | 3 | art rims |
| | 22 | plain frames |
| | 2 | art rims |
| | 53 | pairs single-vision lenses |
| | 16 | pairs bifocal lenses |

In 1975, petitioner transferred an assortment of lenses, glasses, and frames to charitable organizations as follows:

| Organization | | Items given |
|---|---|---|
| Hospital St. Croix-LeOgaine, Haiti ..... | 75 | pairs single-vision glasses |
| | 50 | pairs bifocal lenses |
| | 12 | pairs bifocal glasses |
| | 16 | pairs single-vision glasses |
| | 324 | pairs single-vision lenses |
| | 192 | pairs bifocal lenses |
| | 48 | pairs single-vision lenses |
| | 43 | pairs bifocal glasses |

Hospital St. Croix-LeOgaine, Haiti, is a medical facility operated by the foundation which has a clinic in which eye examinations are given. Various persons, on behalf of the foundation, contact individuals in an effort to obtain used lenses, frames, and eyeglasses for use in its work. Although all of the professional people working in the clinics of the foundation are volunteers, only about 10 percent of the persons approached on behalf of the foundation agree to attempt to collect glasses, frames, and lenses for the foundation. For these items to be useful in the foundation's work it is necessary that the person who collects them examine them and catalog them as to the type of lenses and the degree of refraction contained in the lenses. This work can be time consuming and many individuals approached on behalf of the foundation were unwilling to spend the time necessary to catalog the various items.

Each time petitioner received glasses or lenses from a patient or a friend, he would catalog them and place them in an envelope containing the proper marking as to the type of lenses, showing their refractions and other appropriate data. The foundation bought no glasses or lenses for use in its benevolent work. All the glasses, frames, and lenses used in the benevolent work of the foundation were used glasses, frames, or lenses which had been donated or transferred to it by various individuals.

The assortment of glasses, lenses, and frames transferred by petitioner to Hospital St. Croix-LeOgaine, Haiti, in 1975 were transferred through Dr. Rufus B. Antley of West Columbia, S.C. On December 31, 1975, petitioner mailed 72 pairs of edged single-vision lenses, 50 pairs of edged bifocal lenses, 12 pairs of edged bifocal lenses, and 16 pairs of edged single-vision lenses and frames to Dr. Antley for transfer to Hospital St. Croix by insured mail. The total insurance coverage on the package was $50.

Petitioner in his practice of optometry did not buy or sell used glasses or lenses either directly or by allowing a trade-in of such used glasses or lenses on new glasses. Any such glasses or lenses used by petitioner in his practice were to fit an indigent with such glasses or lenses free of charge. During the years 1973,

1974, and 1975, and years prior thereto, there was no market in the United States for sale of used eyeglasses, lenses, or frames.

Petitioners on their Federal income tax return for the calendar year 1973 claimed a deduction for a charitable contribution for the frames and eyeglasses which petitioner had transferred to charitable organizations in the amount of $12,450. Petitioner computed the amount of this claimed charitable deduction by determining the type of glasses, lenses, or frames included in the contribution and the amount he paid for similar items, reducing this amount by 40 percent. For the years 1974 and 1975, respectively, petitioners on their Federal income tax returns claimed total deductions of $24,838 and $15,725 for the eyeglasses, lenses, and frames transferred by petitioner to various charitable organizations. The amount of these claimed deductions was computed by petitioner by determining the retail price which he generally charged for similar items and reducing the price so determined by 40 percent.

Respondent, in his notice of deficiency, recognized that the organizations to which petitioners transferred the eyeglasses, lenses, and frames were charitable organizations qualified as exempt organizations within the meaning of section 170(c), I.R.C. 1954,[1] so that contributions to these organizations were properly deductible by a taxpayer. Respondent, in his notice of deficiency, disallowed petitioners' claimed contribution for the eyeglasses, frames, and lenses for each of the years 1973, 1974, and 1975 except to the extent of $576, $855, and $757, respectively. Respondent increased petitioners' gross income as reported on their returns by the respective amounts which he had allowed of the claimed charitable contribution of the eyeglasses, frames, and lenses. In explanation of his adjustments, respondent stated that petitioner solicited the glasses from various individuals by representing to them that these items would be contributed to various charitable organizations. Respondent further explained that there was no market for used eyeglasses, lenses, or frames, and that the amount of claimed charitable contribution not disallowed by him was based on the estimated value of the gold content in the frames transferred to the various charitable organizations. In this explanation, respondent further stated

---

[1]All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

that the value of the eyeglasses received by petitioner and then transferred by him to various charitable organizations is includable in petitioners' gross income, citing Rev. Rul. 70–498, 1970–2 C.B. 6.

## OPINION

Respondent's primary position in this case is that petitioner was merely a conduit for the various eyeglasses, frames, and lenses which he collected from patients and friends and transferred to charitable organizations. Respondent points out that petitioner effectively solicited these items for the various organizations either by directly asking that he be permitted to keep the items or indirectly by letting his interest in glasses for the indigents be known in the community of Greenville, S.C. Respondent contends that for this reason, any value that the frames transferred to the charities had when received by petitioner was income to him when he transferred them to charities and claimed a charitable deduction.[2]

Petitioner argues that he did not solicit the used lenses and glasses but rather they were given to him voluntarily by his various patients and friends. Petitioner states that he made no representation to the individuals when the glasses were brought in to him or when he retained the glasses or lenses after fitting a patient with new glasses as to what he intended to do with the items he was collecting. Petitioner argues that the knowledge of many people in the Greenville area of his work with indigents in no way bound him to send the items he collected to charitable organizations. In fact, he did at times use some of the items for local indigents who could not afford eyeglasses and came in to him to see if he could provide them with glasses free of charge. Petitioner argues that because he made no representation as to what he intended to do with the used glasses, frames, and lenses when they were given to him, he is not comparable to the solicitor on behalf of a charitable organization who represents himself to be an agent of that organization to receive and transfer funds.

We consider the record to be reasonably clear that the

---

[2]As hereinafter discussed, respondent contends that the used frames and lenses had no fair market value as used glasses and their only value was the value of the gold content of the frames as determined in the notice of deficiency.

individuals who brought glasses in to petitioner or left glasses with him when fitted with new glasses did this because of their knowledge of petitioner's work with the indigents. However, we agree with petitioner that the facts here are not comparable to a solicitor on behalf of a charity. The individuals who brought in the used glasses and lenses did not specifically designate that they were to go to any specific charity, or in fact did not designate that they were to go to a charitable organization recognized as such under the internal revenue laws. Also, as petitioner points out, there is an indication in the record that some of his patients were not aware of his work with the foundation and had no reason to believe that the used glasses or lenses would go to a recognized charity as distinguished from being given to a needy person living in the Greenville area. In any event, the patients who permitted petitioner to retain their old glasses or lenses did not do so with the definite understanding that petitioner would transfer these items to a charitable organization. In our view, this fact distinguishes the facts with respect to the glasses and lenses accumulated by petitioner from patients from the facts present when an individual makes a contribution to a specific charity through a solicitor for that charity. In such circumstances, the solicitor is acting in the capacity of an agent for the charity. From our conclusion in this respect, however, it does not follow that the various individuals intended the glasses, lenses, and frames which were brought in to petitioner or retained by him to be gifts within the meaning of the Federal income tax provisions.

In *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960), the Court held that the term "gift" as used in the revenue Code does not necessarily have the same meaning as it does in the common law, stating—

the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. This Court has indicated that a voluntarily executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * *

Following this quote, the Court pointed out that a gift as used in the revenue laws must proceed from a detached and disinterested generosity or out of affection, respect, admiration, charity, or

like impulses. The Court called attention to the fact that in making the determination of whether a gift had been made, the most critical consideration is the transferor's intention.

We have concluded that the individuals who brought glasses or lenses to petitioner or left them with him did not do so with the direct understanding that petitioner was their agent or conduit for transferring them to a charitable organization. For this reason, the glasses and lenses may have been "gifts" to petitioner under the common law definition of gift. They were not, however, gifts within the meaning of the income tax laws.

In our view, the record is reasonably clear that these items were not brought to or left with petitioner by the various individuals out of detached and disinterested generosity towards petitioner or out of affection, respect, admiration, charity, or like impulses toward him. Most of the items were brought to or left with petitioner because of the knowledge the friends or patients of petitioner had of his charitable work. It was the intention on the part of these individuals that these items be used by petitioner for some needy person or good cause, even though the items might not be transferred to a recognized charitable organization. We recognize that these individuals did not state the use to which they expected the items to be put and that petitioner would not have violated a trust had he used the items for personal purposes as would a solicitor for a charity. For this reason, petitioner did have complete control and dominion over the various items brought in to him or left with him as he argues. Legally, he could have treated these items as his own. Because of our view of the underlying intention of the individuals bringing the items in to petitioner and his legal rights with respect to these items, we conclude that petitioner is entitled to a deduction for a charitable contribution when he transferred these items to various charities to the extent of the fair market value of the items when they were so transferred, if he meets other requirements of the statutes governing charitable deductions.

Section 170(a)(1) provides for the allowance of a deduction for charitable contributions as defined in section 170(c). Section 170(e)(1) provides that, with certain exceptions, the amount of the charitable contribution made in property shall be reduced by the gain on such property if such gain would not be long-term capital gain, and for the years here in issue, in some circum-

stances, by 50 percent of the gain if the gain would have been long-term capital gain.[3] Section 1.170A–1(c), Income Tax Regs., as applicable to the years here in issue, provides that where a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1). Section 1.170A–1(c)(2), Income Tax Regs., defines fair market value as the price at which the property would change hands between a knowledgeable willing buyer and a knowledgeable willing seller.[4]

Petitioner, himself, testified in this case that there was no market for used eyeglasses, frames, or lenses in this country for use as eyeglasses, and so did the expert in the marketing of these items who testified on behalf of petitioner. Every witness that testified specifically stated that they knew of no instance in which used eyeglasses, frames, or lenses had ever been sold. Petitioner testified in detail to this fact. While, as petitioner points out, the items had a great value to the recipients of

---

[3] Sec. 170(e)(1) provides in part as follows:

(e) CERTAIN CONTRIBUTIONS OF ORDINARY INCOME AND CAPITAL GAIN PROPERTY.—

(1) GENERAL RULE.—The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—

(A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), and

(B) in the case of a charitable contribution—

(i) of tangible personal property, if the use by the donee is unrelated to the purpose or function constituting the basis for its exemption under section 501 (or, in the case of a governmental unit, to any purpose or function described in subsection (c)), or

(ii) to or for the use of a private foundation (as defined in section 509(a)), other than a private foundation described in subsection (b)(1)(E).

50 percent (62½ percent, in the case of a corporation) of the amount of gain which would have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution).

[4] Sec. 1.170A–1(c)(1) and (2), Income Tax Regs., provides as follows:

(c) *Value of a contribution in property.* (1) If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1) and paragraph (a) of sec. 1.170A–4.

(2) The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers.

glasses from the charitable organizations, an intrinsic value to an individual of an item is not its fair market value. The record is clear that these recipients would not and could not have paid for the glasses or lenses they received. We therefore conclude that petitioner has failed to show that the items transferred to the various charities had any fair market value for use as eyeglasses within the meaning of section 1.170A–1(c)(2), Income Tax Regs.

This conclusion would dispose of this case except for the fact that respondent, in his determination, made an estimate of the value of the gold in the various frames which petitioner transferred to the charitable organizations and on this basis determined a small fair market value for the items transferred. Respondent also determined that these frames had the same value when received by petitioner as they had when he transferred them to the various charities. The record does not show the amount of gold in the frames transferred to the various charities. However, respondent's determination is presumptively correct. Petitioner has shown no error in this determination and respondent did not affirmatively allege any error in his determination as set forth in the notice of deficiency or offer any evidence to show any such error.

It should be noted that the situation with respect to the fair market value of the frames which petitioner had purchased and transferred to charitable organizations is not different from that with respect to frames collected by him from others. The evidence is clear that there was no market for frames which had been used for display purposes. Also, the facts show that petitioner had deducted the cost of these frames in computing his taxable income. Section 1.170A–1(c)(3) and (4), Income Tax Regs., specifically provides that costs and expenses incurred in the year of contribution in acquiring the contributed property are not deductible and are not a part of the contributor's cost of goods sold. Also, cost of goods sold must be reduced to the extent such costs incurred in prior taxable years are reflected in the cost of goods sold in the year of contribution.[5] The record here

---

[5]Sec. 1.170A–1(c)(3) and (4), Income Tax Regs., provides as follows:

(c) *Value of a contribution in property.* * * *

    *       *       *       *       *       *       *

(3) If a donor makes a charitable contribution of property, such as stock in trade, at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not

shows that the display frames contributed by petitioner in 1973 had been treated by him as a part of his cost of goods sold. The record is not clear as to the year in which these items were acquired. However, the record does not show that they were not acquired in the year in which they were transferred to the charity. If petitioner had shown a fair market value of these frames when they were transferred to the charitable organizations, he would not be entitled to a deduction for this amount since any fair market value would represent the gain he would have had if the items had been sold.[6]

The final issue here is whether respondent properly increased petitioners' income by the value for the frames which petitioner transferred to the various charities as determined in the notice of deficiency.[7] In support of his position that petitioners' income

---

the usual selling price but is the amount for which the quantity of property contributed would have been sold by the donor at the time of the contribution.

(4) Any costs and expenses pertaining to the contributed property which were incurred in taxable years preceding the year of contribution and are properly reflected in the opening inventory for the year of contribution must be removed from inventory and are not a part of the cost of goods sold for purposes of determining gross income for the year of contribution. Any costs and expenses pertaining to the contributed property which are incurred in the year of contribution and would, under the method of accounting used, be properly reflected in the cost of goods sold for such year are to be treated as part of the cost of goods sold for such year. If costs and expenses incurred in producing or acquiring the contributed property are, under the method of accounting used, properly deducted under section 162 or other section of the Code, such costs and expenses will be allowed as deductions for the taxable year in which they are paid or incurred, whether or not such year is the year of the contribution. Any such costs and expenses which are treated as part of the cost of goods sold for the year of contribution, and any such costs and expenses which are properly deducted under section 162 or other section of the Code, are not to be treated under any section of the Code as resulting in any basis for the contributed property. Thus, for example, the contributed property has no basis for purposes of determining under section 170(e)(1)(A) and paragraph (a) of sec. 1.170A–4 the amount of gain which would have been recognized if such property had been sold by the donor at its fair market value at the time of its contribution. The amount of any charitable contribution for the taxable year is not to be reduced by the amount of any costs or expenses pertaining to the contributed property which was properly deducted under section 162 or other section of the Code for any taxable year preceding the year of the contribution. This subparagraph applies only to property which was held by the taxpayer for sale in the course of a trade or business. * * *

[6]Since there is no showing to the contrary, we must assume that the value of gold in the frames transferred by petitioner to the charities as determined by respondent did not include the gold, if any, in petitioner's display frames.

[7]Petitioner claims that the frames, lenses, and glasses he received were gifts and, as such, the value of these items is not includable in his income. Although neither party discusses the question of petitioner's basis in the glasses, lenses, and frames if these items were acquired by gift, the record, as a whole, is clear that this basis would exceed the "fair market value of the gold" in the frames which respondent determined petitioner acquired in these items as a receipt of income. Sec. 1015(a), I.R.C. 1954, provides with respect to the basis of property acquired by gift as follows:

SEC. 1015. BASIS OF PROPERTY ACQUIRED BY GIFTS AND TRANSFERS IN TRUST.

(a) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except that if such basis (adjusted for the period before the date of

should be so increased, respondent relies on *Haverly v. United States,* 513 F.2d 224 (7th Cir. 1975), and his Rev. Rul. 70–498, 1970–2 C.B. 6. The *Haverly* case and the revenue ruling each involved books received by an individual in connection with his work and later contributed by that individual to a charitable organization during years prior to the amendments of section 170 by the Tax Reform Act of 1969. However, neither party contends that these amendments affect this case, both apparently recognizing that the glasses, lenses, and frames received by petitioner had the same value when received as when transferred to the charities. The *Haverly* case involved books furnished by the publishers to a principal of an elementary school for him to keep or use as he saw fit. The publishers had furnished the taxpayer with these books in the hope that he would recommend the use of the books in the school program. In the *Haverly* case, the parties stipulated that the books were not a gift within the meaning of the revenue laws. However, it was clear from the facts that the taxpayer had the right to use the books as he saw fit. The court in *Haverly,* at page 226, pointed out that the taxpayer's "intent to exercise complete dominion over unsolicited samples is demonstrated by donating those samples to a charitable institution and taking a tax deduction therefor." The court concluded that the receipt of the textbooks was unquestionably an "accession to wealth" of the taxpayer and, since they were not gifts, their value was includable in his taxable income. The court recognized that a problem existed because not all the books donated in a particular year had been acquired by the taxpayer in that same year. In the *Haverly* case, the court concluded that it was the act of the taxpayer in taking a deduction for the donated books which caused his receipt of income, and therefore, the Government had correctly offset the

---

the gift as provided in section 1016) is greater than the fair market value of the property at the time of the gift, then for the purpose of determining loss the basis shall be such fair market value. If the facts necessary to determine the basis in the hands of the donor or the last preceding owner are unknown to the donee, the Secretary or his delegate shall, if possible, obtain such facts from such donor or last preceding owner, or any other person cognizant thereof. If the Secretary of his delegate finds it impossible to obtain such facts, the basis in the hands of such donor or last preceding owner shall be the fair market value of such property as found by the Secretary or his delegate as of the date or approximate date at which, according to the best information that the Secretary or his delegate is able to obtain, such property was acquired by such donor or last preceding owner.

In any event, we have determined that the glasses, lenses, and frames were not gifts to petitioner as used in Federal income tax law.

amount of the charitable contribution by an equal amount of income.

Respondent's Rev. Rul. 70–498, *supra,* involved a newspaper book reviewer who received unsolicited books from publishers and later donated those books to charity. That ruling, which superseded Rev. Rul. 70–330, 1970–1 C.B. 14, which had held the mere retention of such unsolicited books caused them to be gross income, considered the books to be gross income to the taxpayer when he donated them to the charity as did the court in the *Haverly* case.

It is clear in the *Haverly* case and from the facts stated in Rev. Rul. 70–498, *supra,* that the books received by the individual who later donated them to charity were not received as gifts. In the *Haverly* case this fact was stipulated by the parties. In the revenue ruling this fact is assumed.

In the instant case, we have held for reasons heretofore stated that the eyeglasses, frames, and lenses received by petitioner were not gifts within the meaning of "gift" as used in the income tax laws. *Commissioner v. Duberstein,* 363 U.S. 278, 285 (1960). Therefore, the situation here does not differ with respect to the nature of the items donated from the situation in the *Haverly* case. In the instant case, however, there is no specific identification of the various items transferred to the charities. From the facts here, we are unable to tell whether the items transferred by petitioner to the charities had been acquired by petitioner in the current year or in prior years. The record is clear that petitioner continued through the years here in issue to receive eyeglasses, lenses, and frames from patients and friends. There is no showing of the extent to which the items transferred to the charities were acquired in the year of transfer. The indication from the record is that to the extent the items transferred had been acquired by petitioner in prior years, he received directly comparable items in the year he made the transfer to the charities. Therefore, in this case, we need not reach the issue of when the glasses, lenses, and frames received by petitioner became income to him to the extent of their fair market value, if any. We therefore are not required to decide the issue with respect to when nongift items which a taxpayer receives without cost and which he later donates to a charity become income to him as determined in the *Haverly* case and Rev. Rul. 70–498, *supra.* We decide this case on petitioner's

failure to show error in respondent's determination as to his receipt of income in the years here in issue.

Respondent's basis for his adjustment to petitioner's income is the amount of the fair market value of the gold content of the frames which petitioner transferred to charitable organizations. There is no evidence whatsoever in this case of the amount of the gold content of the frames received by petitioner or the frames transferred by him. There is no evidence of any value of the frames received by petitioner in the years here in issue or the frames transferred by petitioner in the years here in issue to charitable organizations other than the gold content of those frames as determined by respondent. Because of petitioner's failure of proof to the contrary, we sustain respondent's determination with respect to the amounts of the charitable deductions to which petitioner is entitled and the amounts of income he received by the transfer to him of the glasses and frames.

Because of stipulated adjustments to petitioners' taxable income for the years here in issue,

*Decision will be entered under Rule 155.*